Filed 10/29/25  In re F.S. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| In re F.S., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E085750 |
| Plaintiff and Respondent, | (Super.Ct.No. DPRI2400486) |
| v. | OPINION |
| J.S. et al., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dorothy McLaughlin, Judge.  Reversed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant J.S.

Elizabeth C. Alexander, under appointment by the Court of Appeal, for Defendant and Appellant K.S.

1

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Julie K. Jarvi, Deputy County Counsel for Plaintiff and Respondent.

J.S. (Mother) and K.S. (Father) appeal from the juvenile court's jurisdictional finding and dependency disposition ordering family maintenance service to ensure F.S. (Minor, a girl, born in December 2010) receives educational and related psychological services to address her learning challenges, as well as regular, routine medical and dental care. Minor had not attended school for four years, since May 2020, nor did her parents arrange homeschooling or any services to address her autism or attention deficit hyperactivity (ADHD) diagnoses. Before the outbreak of the global Covid-19 pandemic, her parents regularly took Minor to medical and dental appointments. They did not do so again, however, until social workers from the Riverside County Department of Social Services (DPSS, or the Department) contacted the family. Before DPSS's involvement, they did take Minor to the emergency room for treatment of an eye infection that resolved with the visit.

Mother and Father contend the juvenile court lacked statutory authorization to assume dependency jurisdiction over Minor. They rely on the grounds DPSS asserted for jurisdiction, each of which required "a substantial risk that the child will suffer, serious physical harm or illness" due to specified conduct or neglect. (Welf. & Inst. Code, § 300, subd. (b)(1).[1]) The Department concedes it is well-established that failure to attend school does not by itself support jurisdiction based on a risk of serious physical

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

harm or illness. (*In re Destiny S.* (2012) 210 Cal.App.4th 999 (*Destiny S.*); *In re Janet T.* (2001) 93 Cal.App.4th 377 (*Janet T.*).) The Department argues that three cavities discovered and filled at dental appointments before the jurisdictional hearing sufficed to show a substantial risk of serious future physical harm. No authority supports that proposition. We therefore reverse the jurisdictional finding and remand the matter for further proceedings.

## BACKGROUND

In October 2024, DPSS received a referral alleging general neglect of Minor, including that the home where she lived with Mother and Father (collectively, Parents) smelled like a "dead animal." The referral indicated that the residence was dark, the windows were covered with bed sheets or loose clothes, and 13-year-old Minor was dirty, had poor body hygiene and smelled foul, as did Mother. The referral arose after Father said that Minor did not leave the home or go to school. He reportedly also said Minor need not go outside because she would die before she turned 18, with the impending end of the world.

A police welfare check arranged by DPSS disclosed no imminent safety concerns for Minor. The home had sufficient food, no obvious safety hazards, and working utilities. The responding officer found Parents to be "a little weird" and "off," making no eye contact during the visit. Minor, however, felt safe and perceived nothing wrong in their care. Minor last attended school more than four years previously in May 2020, when she was in elementary school. Someone had enrolled her to continue elementary school in August 2020, but disenrolled her the same day. Parents never reenrolled her.

3

Two social workers visited the home in November 2024.  Upon their arrival, Mother became upset and suspicious, wanted to "call the FBI on the neighbors," and presented as distracted and disengaged.  She reiterated on random topics, was unable to maintain the discussion, and stared into the distance, repeating statements.

The worker met with Minor, who disclosed she had been diagnosed with both autism and ADHD.  Father confirmed Minor did not receive treatment or services for either condition since leaving school.  Minor said her parents preferred home healthcare methods but neither she nor her parents disclosed or elaborated on what they might be, if any.  Minor brushed her teeth, but had not seen a dentist "in a while."  Nor could she recall the last time she had seen her doctor for a physical exam.  An eye infection, however, had progressed to requiring an emergency room visit within the last year.  The visit apparently resolved the issue, with no reoccurrence or need for further visits noted in the record.

Minor, at age 13, claimed to still be enrolled in one of the elementary schools the worker had checked.  When asked why she was not attending classes during school hours, Minor said she " 'logged off early today.' "  She reported that she felt safe in the home.  She did not fear either of her parents, who sometimes had " 'screaming matches' " over " 'things such as "the internet." ' "  Minor shared that she occasionally walked her dog outside.

Mother claimed initially that Minor was homeschooled, but she was unable to point to any supporting curriculum, textbooks, or resources. Mother confirmed Minor had not been enrolled in school since 2020.  In addition to " 'school shooters and the rest of

4

the chaos in the world,' " she and Father worried that "LGBTQ" staff members at school would " 'lure children [there] with candy to molest them.' " When Mother acknowledged Minor's autism diagnosis, Father interjected, yelling from the other room, " 'Stop labeling [her]!' " Mother knew of services available from the Inland Regional Center, but rejected aid there by stating that no one was allowed in her home. Mother claimed to be administering " 'homeopathic' " remedies " 'to address [Minor's] autism,' " but did not say what they were.

Mother also confirmed that Minor had not seen a doctor since 2020. Mother said Minor's physician at that time required that she " 'be vaccinated,' " which Mother refused. Mother did not seek substitute, regular medical care or checkups for Minor, nor did Father, and neither ensured any dental care for Minor. Mother became defensive, hostile, and loud when the worker raised the topic of schooling. Mother insisted it was " 'her right not to have [Minor] in school.' " She also said she did not care if Minor " 'drops dead and dies,' " made statements that she thought the world was ending, and reiterated several times that she intended to move from the home. She did not say when the move might take place or whether she would take Minor. Mother agreed to schedule a physical for Minor. She also said she would call the school district "[that] week" to inquire about "online school" for Minor, but " 'only once and that's it.' "

When Father began yelling about the social workers "sinning," Minor had to intervene as if she were the parent. She requested that the social workers leave. As they departed, Mother continued to talk about moving away. Shortly thereafter, Mother called one of the workers and left several lengthy voicemails, which included complaints about

Mother's social security income being too high. She affirmed she was "willing" to contact both a primary care physician for Minor and the school district. Mother later also said she would contact Inland Regional Center regarding autism services.

Mother did not respond to the social worker's subsequent follow-up phone call and voicemail the next week. The worker made a trip to the home two days later but, despite evident movement inside, no one answered the door. Nor did Mother answer her phone.

On a home visit the next week, Minor answered the door. Father was home and agreed to be interviewed. He confirmed Minor had not seen a doctor or dentist nor received any schooling or services since 2020, due to the Covid-19 pandemic at that time. He acknowledged Minor previously had been diagnosed with autism. He did not, however, agree with the autism " 'label.' " Father was on dialysis, for which he received treatment at home 10 hours a day. Father denied that he or Mother suffered from any mental health conditions. Nothing indicated any steps had been taken to enroll Minor in school or to see a doctor or a dentist. Father admitted Minor "has not seen a doctor or dentist since 2020," but "was unable to provide an explanation," according to the social worker.

DPSS filed a dependency petition seeking juvenile court supervision of Minor (§ 300, subd. (b) [failure to protect]), with a recommendation for family maintenance services. The court found a prima facie basis for the petition and ordered that Minor remain in her parents' custody as DPSS recommended.

Later that month, Mother told the social worker that she took Minor to the doctor and the dentist for checkups, stating that neither visit indicated any concerns. Minor, in contrast, disclosed that the dentist found multiple cavities that the dentist wanted to fill, but Mother had not made the appointment. Minor told the social worker she would remind Mother to do so. Mother told the worker that in the years before the pandemic, she scheduled regular doctor and dentist visits for Minor. In speaking with the social worker, Mother continued to refer to the global outbreak of the Covid-19 virus as if it "had just occurred." Her discussion with the social worker suggested to the worker other indications of paranoia, but Mother said she only "ha[d] anxiety and depression."

Parents both acknowledged Minor received special education resources when she had been enrolled in school. They knew an "Individualized Education Program" (IEP) had been developed for Minor, but Father could not recall any of its specifics, and Mother gave no indication she knew either.

Mother provided follow-up information regarding Minor's medical and dental appointments at the social worker's request. The social worker's report reflected the information as follows: "On November 27, 2024, [Mother] went to neighborhood healthcare. In the notes, it indicates [Minor] passed the hearing and vison test, the parent declined vaccinations, diet and exercise was discussed, and the family was advised of dental care every six months and yearly vision exams." The social worker thanked Mother for the information. She also noted Mother's update that Minor had a dental appointment scheduled approximately seven weeks later, in mid-February 2025, about 10 days before the combined jurisdiction and disposition hearing.

7

Further updates for the hearing reflected that, as of the end of December 2024, a referral for Minor for mental health services had gone unfulfilled. The intake manager made multiple unsuccessful attempts to contact Minor's parents to schedule services for Minor. Parents claimed in December 2024 that they were "working on" enrolling Minor in school. As of mid-January 2025, Minor was not enrolled in any public school, and her parents provided no information on whether they arranged private schooling or homeschooling for Minor.

At the jurisdiction hearing in late February 2025, counsel for Father represented that Parents were still "currently working with the Department on trying to get [Minor] an IEP, as well as working with the Regional Center." Counsel for DPSS stated in contrast that Parents had been "minimally cooperative." No mental health services had been arranged for Minor, nor school enrollment, nor any IEP or substitute measures. To the contrary, DPSS summarized that "almost nothing has been done," a situation exacerbated by "a very difficult time having consistent phone contact with the parents." DPSS sought dependency jurisdiction on grounds that included lack of progress on "any necessary steps to address [Minor's] mental health diagnoses." Minor's counsel concurred. DPSS acknowledged that, with its involvement, Minor was "seeing a dentist . . . now," whereas previously that had not been "happening before the Department investigated."

The court sustained some of the allegations of the Department's dependency petition and rejected others. The petition alleged three alternate bases for juvenile court dependency jurisdiction under section 300, subdivision (b), all of which required for jurisdiction, as stated on the face of the petition, that "[t]he child has suffered, or there is

8

a substantial risk that the child will suffer, serious physical harm or illness." (§ 300, subd. (b)(1).)

The petition alleged Minor suffered the requisite harm in one or more of three ways. First: "as a result of the failure or inability of . . . her parent[s] to supervise or protect [her] adequately." Second: "by the willful or negligent failure of the parent[s] . . . to provide [her] with adequate food, clothing, shelter, or medical treatment." And third: "by the inability of [a] parent . . . to provide regular care for the child due to the parent's . . . mental illness, developmental disability, or substance abuse."

The Department alleged one or more of these jurisdictional grounds were satisfied by the following factual allegations, two of which the court rejected as unfounded (Allegations b-3 and b-5) and three of which the court sustained (Allegations b-1, b-2, and b-4).

The court sustained Allegation b-1 as written, as follows: "The mother and father neglect the child's educational and developmental needs, in that the child has not attended school since August of 2020, thereby limiting the child's ability to maintain age-appropriate educational services and/or necessary services to address the child's diagnoses of Autism and Attention Deficit Hyperactive Disorder."

The court sustained Allegation b-2 with interlineations by the court (additions shown by underlining), as follows: "The mother and father neglect the child's medical and dental needs, in that the child has not had a physical or seen a doctor for a routine checkup since 2020, nor has had she seen a dentist before [the] Department's intervention."

9

The court rejected Allegation b-3 for "insufficient evidence" to support jurisdiction at the time of the hearing. The allegation had stated: "The mother and father neglect the health, safety, and wellbeing of the child, in that the home was found to be in unkempt conditions, smelled foul and had limited space to move. Further, the child's sleeping space was covered in clothing and miscellaneous items, causing the child to sleep on a bean bag."

The court sustained Allegation b-4 with interlineations by the court, as follows: "The mother suffers from unresolved mental health issues, including but not limited to exhibiting signs of paranoia, delusions, and experiencing feelings of depression and anxiety. These untreated conditions have prevented the mother from sending the child to school or allowing the child to receive medical/dental care. Further, the mother has failed to obtain treatment and/or medication to address her mental health needs, thereby placing the child's safety and wellbeing at risk." (Strikethrough in original, underline added.)

The court rejected Allegation b-5 regarding Father's mental health as unproven. The allegation mirrored Allegation b-4 as to Mother, but without asserting he suffered from anxiety or depression. The court explained: "(b)(5), I don't find there's sufficient evidence. . . . Understanding there have been behaviors that were described by the social worker, aside from that—or aside from those observations, there's no indication of a mental health diagnosis or issues. The Court doesn't find sufficient evidence of (b)(3) and (b)(5)."

Based on its findings regarding Allegations b-1, b-2, and b-4, the court found Minor to be "[a] person described by Welfare & Institutions Code Section 300(b)(1)."

10

The court declared Minor a court dependent and adopted DPSS's "recommended findings and orders with regard to family maintenance for disposition." The court authorized psychological assessments for both parents as requested by DPSS, finding that "there's observations in the report [for the hearing] that are concerning, so that [referral] will be maintained."

**DISCUSSION**

Parents contend DPSS's dependency petition allegations and the underlying record do not show the requisite "*substantial* risk" of "*serious physical* harm or illness" required by section 300, subdivision (b)(1), to support juvenile court jurisdiction. (Italics added.) They are correct.

Section 300, subdivision (b)(1), provides for juvenile court dependency jurisdiction when a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" specified conduct or neglect by a parent or guardian. These jurisdictional grounds include, as alleged by DPSS in its petition: "(A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child," "(C) The willful or negligent failure of the parent or guardian to provide the child with . . . medical treatment," and "(D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness." (§ 300, subd. (b)(1).)

An earlier version of the statute, as noted by *Janet T.*, "required no separate showing of concrete harm or risk of physical harm to a child." (*Janet T.*, *supra*, 93 Cal.App.4th at p. 387.) Rather, "[a] child could be declared a dependent if he or she

11

was 'in need of proper and effective parental care or control and ha[d] no parent or guardian . . . willing to exercise or capable of exercising such care or control.' However, the 1987 revisions to section 300 added this [serious physical harm or illness] requirement, indicating a legislative intention to narrow the grounds on which juvenile court jurisdiction could be invoked." (*Id*. at pp. 387-388, fns. omitted.)

The statute does not define "serious physical harm or illness," but instead leaves the matter to "common intelligence [to] discern what injuries fall within its reach." (*In re Mariah T.* (2008) 159 Cal.App.4th 428, 438.) Relevant here, medical treatment may include dental care to address or prevent serious physical harm. Thus, a child's "need[ for] extensive dental work, including oral sedation for a tooth fracture, 11 pulpotomies[2] with steel crowns, and three fillings," together with a finding that the father failed to provide food or clothing for his daughters, supported a finding of "substantial risk of serious physical harm to the girls." (*In re A.R.* (2014) 228 Cal.App.4th 1146, 1152.)

The juvenile court " 'need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.' " (*In re S.F.* (2023) 91 Cal.App.5th 696, 712-713.) A parent's " ' "[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' " (*In re Cole* L. (2021) 70 Cal.App.5th 591, 602.) Still, the "basic question under section 300" for both

---

**2** "Pulpotomy" is defined as "Removal of a portion of the pulp structure of a tooth, usually the coronal portion"; "SYN: pulp amputation." (Stedman's Medical Dict. (online ed. 2014) 739660.)

the juvenile court and the appellate court on review is whether circumstances at the time of the hearing subject the minor to the risk of harm enumerated in the statute. (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1022.) " 'Subdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial risk* of *serious physical harm or illness*.' " (*Janet T.*, *supra*, 93 Cal.App.4th at p. 391, fn. omitted.)

A child welfare agency petitioning for dependency jurisdiction bears the burden of proof to establish section 300 applies, and must do so by a preponderance of the evidence. (§ 355; *In re I.J.* (2013) 56 Cal.4th 766, 773.) In particular, the agency must "present evidence of a specific, nonspeculative and substantial risk to [the child] of serious physical harm." (*Destiny S.*, *supra*, 210 Cal.App.4th at p. 1003.)

On appeal, we review the juvenile court's jurisdictional findings for substantial evidence. (*In re B.H.* (2024) 103 Cal.App.5th 469, 480.) " 'In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*I.J.*, *supra*, 56 Cal.4th at p. 773.) We do not reweigh the evidence; instead, provided there is substantial evidence supporting the juvenile court's decision, we affirm the order even if other evidence supports a contrary finding. (*In re M.D.* (2023) 93 Cal.App.5th 836, 857.)

Substantial evidence "means evidence that is 'reasonable, credible and of solid value; it must actually be substantial proof of the essentials that the law requires in a

particular case.' " (*In re E.D.* (2013) 217 Cal.App.4th 960, 966.) "Substantial evidence is not synonymous with any evidence; a decision supported by a ' "mere scintilla of evidence" ' need not be affirmed on appeal." (*In re G.Z.* (2022) 85 Cal.App.5th 857, 876.) "On appeal, the parent has the burden of showing there is insufficient evidence to support the order." (*In re N.M.* (2011) 197 Cal.App.4th 159, 168.)

The Department concedes, as it must, that Minor's nonattendance at school "is not a basis for jurisdiction under section 300, subdivision (b)." (See *Destiny S.*, *supra*, 210 Cal.App.4th 999; *Janet T.*, *supra*, 93 Cal.App.4th 377.) As *Destiny S.* explained, by statute the Legislature has determined that "[j]urisdiction under section 300, subdivision (b) can exist 'only so long as is necessary to protect the child from risk of suffering serious physical harm or illness.' " (*Destiny S.*, at p.1003.) Quoting *Janet T.*, the *Destiny S.* court continued: "Although missing school is a 'serious' problem, 'that is not the same as saying the failure to attend school created a "substantial risk" of suffering "*serious physical harm or illness.*" ' " (*Destiny S.*, at p. 1003), as required for jurisdiction.

The *Janet T.* court found the gap in the children's schooling there extremely troubling, as do we here for Minor. "Failing to attend school regularly not only deprives . . . children of an education, but also of the social interaction and 'peer relationships necessary for normal growth and development,' as alleged in the petition. It is a very serious allegation and a factual circumstance which need[s] immediate correction." (*Janet T.*, *supra*, 93 Cal.App.4th at p. 388.) The court acknowledged that a "lack of education may well cause psychic or emotional or financial or social harm." (*Id.* at p. 389.) Nevertheless, jurisdiction did not follow where "there [were] no facts alleged or

14

suggested by the supporting documentary evidence to indicate [the] mother's failure to ensure the children's regular school attendance subjected the children to physical injury or illness, serious or otherwise." (*Janet T.*, at pp. 388-389.) The same is true here regarding Minor.

Nor do Minor's autism or ADHD diagnoses, perhaps made when she earlier attended school, suggest a different result than in *Destiny S.* or *Janet T.* The Department does not argue as much. Nor does the record support such a distinction. The Department did not obtain Minor's IEP from her elementary school, which may have shed light on the origin of the diagnosis regarding her neurodivergent learning challenges—and their scope or degree. The Department also did not seek to compel Minor's attendance at a mental health evaluation. In any event, nothing in the record—including Minor's engagement with the social workers—indicated a level of severity to Minor's autism or ADHD or any mental health condition suggesting a risk of incurring physical harm to herself. Nor, notably, did the Department choose in investigating or filing its petition to proceed under subdivision (c) of section 300 for "willful failure of [a] parent or guardian to provide adequate mental health treatment." The record developed by the Department does not indicate any risk of, for example, "untoward aggressive behavior toward self" that might warrant jurisdiction under not only subdivision (c)'s "serious emotional damage" provisions, but also subdivision (a)'s risk of "serious physical harm" threshold. (§ 300, subds. (a), (c).)

Instead, the Department relies only on Minor's three cavities. The Department offers no authority that this alone is enough to constitute serious physical harm or a

15

substantial risk of serious physical harm, and we have found none. As noted, in *In re A.R.*, one of the children needed three fillings for cavities, but that was in addition to "extensive dental work," which included sedation to address a tooth fracture, plus almost a dozen pulpotomies and corresponding crowns. (*In re A.R.*, *supra*, 228 Cal.App.4th at p. 1152.) Furthermore, the juvenile court in *A.R.* sustained allegations that the father sexually abused the children, failed to provide them food or clothing; that the mother knew the father had a significant substance abuse and domestic violence history, but nevertheless abandoned them to his care. (*Id.* at pp. 1149, 1152.) She did so even though she admitted "he 'scares the hell out of me'" and she knew he was not providing for them. (*Ibid*.) There is nothing remotely close to such harm or risk of harm here.

The Department asserts that Parents "would not have made appointments to address [Minor's] medical and dental needs without [its] intervention." The Department also argues this "[l]ack of medical and dental care could have led to more serious physical harm" for Minor. Even if the first proposition is true, jurisdiction for failure to provide adequate medical treatment exists "only so long as is necessary to protect the child from risk of suffering serious physical harm or illness." (§ 300, subd. (b)(3); *Destiny S.*, *supra*, 210 Cal.App.4th at p. 1003.) Here, Parents had previously ensured Minor had regular, routine medical and dental care before the Covid-19 pandemic; they learned through engaging in reunification services that they could now obtain that care without the Covid-19 vaccinations to which they objected; Minor made a habit of brushing her teeth, providing some protection against cavities; and Parents ensured Minor obtained medical care for an infection (her eye) when she needed it. Regarding the

16

second proposition, the Department does not say what further harm "could have" been at stake beyond just three cavities, and we also decline to speculate. Evidence supporting jurisdiction based on risk of serious physical harm must be specific and nonspeculative. (*Destiny S.*, at p. 1003.)

On the record presented here, and barring mere speculation, we find the evidence insufficient as a matter of law to demonstrate Minor faced the requisite substantial risk of serious physical harm or illness required for dependency jurisdiction under section 300, subdivision (b).

We are guided to this conclusion by considering the Supreme Court's analytic framework to assess whether a risk of harm is substantial. " 'Some risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great. . . . Conversely, a relatively high probability that a very minor harm will occur probably does not involve a "substantial" risk. Thus, in order to determine whether a risk is substantial, the court must consider both the likelihood that harm will occur and the magnitude of potential harm.' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 778.)

Similarly, as *Janet T.* set out, "[i]n determining what constitutes a substantial risk of serious physical harm" in section 300, subdivision (b), courts may look to language in subdivision (a) authorizing jurisdiction when a parent or guardian has inflicted " 'serious physical harm . . . nonaccidentally.' " (*Janet T.*, *supra*, 93 Cal.App.4th at p. 388; see § 300, subd. (a).) Specifically, "a court may find there is a substantial risk of serious future injury based *on the manner in which a less serious injury was inflicted*, a *history of*

17

*repeated inflictions* of injuries on the child or the child's siblings, or a *combination of these and other actions* by the parent or guardian that indicate the child is at risk of serious physical harm."  (§ 300, subd. (a), italics added.)

Here, there was no history of Parents causing injuries as serious or less serious than Minor's three cavities.  Nor that they did so repeatedly:  there was no history of other physical harms caused by Mother or Father.  Nothing in the record indicated they were responsible for Minor's eye infection, nor that it was severe or nonresponsive to Parents' treatment measures.  Regarding Minor's cavities, the Department did not present evidence indicating whether she had others in the past or whether this type of "injury" was newly due to Parents' nontreatment choices during the Covid-19 pandemic.  Nor, unlike the egregious harms the children suffered in *A.R.*, was there a combination of less serious harms (three fillings as the least of horrific harm there) with other actions causing serious physical harm in *A.R.*, nor any nonspeculative substantial risk of a combination of any specific harms harm.  Nor unlike in *I.J.* does there appear to be any low-probability-but-absolute-magnitude risk of harm like potential sexual abuse of the father's sons there after he abused his daughter.  (*I.J.*, *supra*, 56 Cal.4th at pp. 771, 778-780.)

In sum, measured against the degree of harm at stake, as established by the record (three cavities in a young teenager, found after a global pandemic), and the likelihood and magnitude of other potential, unknown harm (left unstated and only speculative by the Department), we conclude the evidence here is too slight to establish jurisdiction under section 300, subdivision (b).

This is true not just as to the Department's assertion of juvenile court jurisdiction under section 300, subdivision (b)(1)(C) [inadequate medical treatment], as alleged by the Department in its dependency petition, but also the Department's alternate grounds under subdivisions (b)(1)(A) [failure to adequately protect or supervise child] and (b)(1)(D) [inability to care for child due to mental illnes]. Each of these subparagraphs of section 300, subdivision (b), equally required substantial evidence of a substantial risk of serious physical harm or illness. (§ 300, subd. (b).) The only specific, nonspeculative evidence the Department put forward of physical harm or risk of physical harm was Minor's cavities. Regarding jurisdiction based on Mother's mental health for instance, the Department on appeal still cites only Minor being "diagnosed with having three cavities." That evidence being insufficient under one subprong of subdivision (b) for lack of risk of physical harm, it is insufficient under the others as well.

We remain troubled by Minor's education deficits, especially given her mental health diagnoses. The record reflects Parents were still attempting to obtain Minor's IEP and arrange school enrollment for her at the time of the jurisdiction hearing. Father's representation through counsel at the hearing that he and Mother were "currently working with the Department on trying to get [Minor] an IEP, as well as working with the Regional Center" for mental health services suggests Parents may be receptive to voluntary Departmental assistance to secure these essential services. As the concluding paragraph of section 300 states, the statute "is not intended to limit the offering of voluntary services to . . . families in need of assistance."

19

Furthermore, if on remand, concerns for Minor's well-being have not been resolved, our conclusion here that the evidence was insufficient to support jurisdiction on the grounds alleged does not preclude the Department from acting to protect Minor. As *Janet T.* observed there, "[I]t is entirely possible valid grounds exist for the state to assume jurisdiction over these children and indeed it may be in the children's best interests for this to happen." (*Janet T.*, *supra*, 93 Cal.App.4th at p. 392.) We decide here only that the Department "failed to prove the grounds it asserted or to assert the grounds it might have proved." (*Ibid.*) Consequently, the juvenile court's jurisdictional order must be reversed, as well as the dispositional order and any subsequent orders dependent upon it. (*Ibid.*)

## DISPOSITION

The juvenile court's jurisdictional order, dispositional order, and subsequent related orders, if any, are reversed, and the matter is remanded.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER_____

J.

We concur:

McKINSTER_____

Acting P. J.

RAPHAEL_____

J.

20